**BRODSKY & SMITH, LLC**
Evan J. Smith, Esq. (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esq. (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION WILLIAMS MOORE and DAVID STEIN, Derivatively on Behalf of NETFLIX, INC., | ) ) ) Case No.: |
| Plaintiffs, | ) ) ) |
| v. | ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT FOR** |
| REED HASTINGS, RICHARD BARTON, RODOLPHE BELMER, MATHIAS DOPFNER, TIMOTHY HALEY, JAY HOAG, LESLIE KILGORE, ANN MATHER, SUSAN RICE, BRADFORD SMITH, and ANNE SWEENEY, | ) **VIOLATIONS OF SECURITIES LAW** ) **AND BREACH OF FIDUCIARY DUTY** ) ) ) ) ) **JURY TRIAL DEMANDED** ) |
| Defendants, | ) ) |
| -and- | ) ) ) |
| NETFLIX, INC., | ) ) |
| Nominal Defendant | ) ) |
| _____ | ) |

Plaintiffs Dion Williams Moore and David Stein ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Netflix, Inc. ("Netflix" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Netflix with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Netflix against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that occurred from April 17, 2019 through the present (the "Relevant Period") and have caused substantial harm to Netflix. Plaintiffs seek to remedy Defendants' violations of state and federal law during the Relevant Period that have caused and continue to cause substantial monetary losses to Netflix and other damages, including damages to its reputation and goodwill.

2.      Netflix is a subscription-based streaming service with 57 million members in the United States, and nearly 150 million paid subscribers worldwide.   In May 2002, Netflix initiated its initial public offering ("IPO") by selling 5.5 million shares at a price of $15 per share to bring the Company's evaluation to $82.5 million.  Today, a share is worth $339 and the Company is valued at $147 billion.

3.      During the Relevant Period, Netflix knowingly misrepresented to shareholders that it would meet its expected target number of 5.0 million new subscribers in the second quarter of 2019, when, in fact, it only saw 2.7 million and knew that it would not meet the 5 million target due to price increases, which it denied would have a material impact on subscriber growth

4.      Worse than that, Netflix actually lost 126,000 subscribers in its second quarter of 2019.  That's the first time in Netflix's history that it's lost subscribers in the United States, its largest market.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.      Netflix should have easily known that it lost subscribers, or at the very least, minimal subscriber growth in areas where its price increase went into effect.

6.      Netflix's wrongful conduct was exposed on July 17, 2019, when the Company released its earnings results for the second quarter of 2019, which showed that it had significantly underperformed its new subscriber forecasts and had lost hundreds of thousands of subscribers in the United States. The Company conceded that the price increases had negatively impacted subscriber growth.

7.      On this news, the Company lost approximately 16 billion from its market cap and the share price dropped approximately 14%, or $51.82, over the next several trading days following the announcement of second quarter 2019 results.

8.      As discussed herein, the Director Defendants (defined below) breached their fiduciary duties by personally making and/or causing the Company to issue false and misleading statements regarding the Company's business prospects and subscriber growth.

## JURSIDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C. § 1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Netflix maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Netflix, occurred in this District; and (iv) Defendants have received substantial

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiffs**

12.     **_Plaintiff Dion Williams Moore_** ("Plaintiff Moore") is a current owner of Netflix stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein. Plaintiff Moore will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.  Plaintiff Moore is a citizen of Connecticut.

13.     **_Plaintiff David Stein_** ("Plaintiff Stein") is a current owner of Netflix stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein. Plaintiff Stein will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.  Plaintiff Stein is a citizen of New York.

**Nominal Defendant**

14.     Nominal Defendant Netflix is a media-services provider and production company. Netflix's primary business is its subscription-based streaming service which offers online streaming of a library of films and television programs, including original content produced in-house.  As of April 2019, Netflix had over 148 million paid subscriptions worldwide, including 60 million in the United States. The Company is incorporated in Delaware with principal executive offices located at 100 Winchester Circle, Los Gatos, CA 95032. Netflix trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NFLX".  Netflix is a citizen of California.

**Director Defendants**

15.     **_Defendant Reed Hastings_** ("Hastings") co-founded Netflix in 1997. Hastings is and has always served as Netflix's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors ("Board").  Defendant Hastings is a citizen of California.

16.     Defendant Hastings served on the board of directors of Microsoft from 2007 to 2012, during which time Defendant Bradford Smith (discussed below) served as one of Microsoft's longest serving and highest-ranking officers, having joining Microsoft in 1993.

17.     According to the Company's latest Form DEF 14A filed with the SEC on April 23, 2019 (the "DEF 14A"), as of April 8, 2019, Defendant Hastings beneficially owned 10,060,095 shares of the Company's common stock, representing 2.28% of all outstanding shares. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Hastings owned over $3.6 billion worth of Netflix stock. For the fiscal year ended December 31, 2019, Defendant Hastings will receive $700,000 in salary and $30.8 million in allocated stock options.

18.     *Defendant Richard Barton* ("Barton") has served as a member of Netflix's Board since 2002. Barton is a member of the Audit Committee.  Defendant Barton is a citizen of California.

19.     In late 2004, Defendant Barton co-founded Zillow Group and is currently its Executive Chairman of the Board.  Defendant Jay Hoag is and has been a director of Zillow Group for the past 13 years.

20.     Defendant Barton was employed by Microsoft in 1994, when he founded Expedia, and he successfully spun it out as a private company in 1999. During this time, Defendant Bradford Smith (discussed below) was a high- ranking employee at Microsoft.

21.     According to the DEF 14A, as of April 8, 2019, Defendant Barton beneficially owned 80,709 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Barton owned over $29 million worth of Netflix stock.

22.     According to the DEF 14A, during 2018, Defendant Barton received option awards valued at $377,861 as compensation for serving on the Company's Board.

23.     *Defendant Rodolphe Belmer* ("Belmer") has served as a member of Netflix's Board since 2018.  Belmer is a member of the Compensation Committee.  Defendant Belmer is a citizen of France.

24.     According to the DEF 14A, as of April 8, 2019, Defendant Belmer beneficially owned 2,899 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Belmer owned over $1 million worth of Netflix stock.

25.     According to the DEF 14A, during 2018, Defendant Belmer received option awards valued at $347,147 as compensation for serving on the Company's Board.

26.     **Defendant Mathias Dopfner** ("Dopfner") has served as a member of Netflix's Board since 2018.  Defendant Dopfner is a citizen of Germany.

27.     According to the DEF 14A, as of April 8, 2019, Defendant Dopfner beneficially owned 1,363 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Dopfner owned over $490,000 worth of Netflix stock.

28.     According to the DEF 14A, during 2018, Defendant Dopfner received option awards valued at $96,129 as compensation for serving on the Company's Board.

29.     **Defendant Timothy Haley** ("Haley") has served as a member of Netflix's Board since 1998.  Haley is the Chair of the Compensation Committee.  Defendant Haley is a citizen of California.

30.     According to the DEF 14A, as of April 8, 2019, Defendant Haley beneficially owned 34,046 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Haley owned over $12 million worth of Netflix stock.

31.     According to the DEF 14A, during 2018, Defendant Haley received option awards valued at $377,861 as compensation for serving on the Company's Board.

32.     **Defendant Jay Hoag** ("Hoag") has served as a member of Netflix's Board since 1999.  Hoag is a Lead Director, Chair of the Nominating & Governance Committee, and a member of the Compensation Committee.  Defendant Hoag is a citizen of California.

33.     Defendant Hoag is and has been a director of Zillow Group for the past 13 years.  In late 2004, Defendant Barton co-founded Zillow Group and is currently its Executive Chairman of the Board.

34.     According to the DEF 14A, as of April 8, 2019, Defendant Hoag beneficially owned 4,989,977 shares of the Company's common stock, representing 1.14% of all outstanding shares.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 5 -

Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Hoag owned over $1.8 billion worth of Netflix stock.

35.     According to the DEF 14A, during 2018, Defendant Hoag received option awards valued at $377,861 as compensation for serving on the Company's Board.

36.     ***Defendant Leslie Kilgore*** ("Kilgore") has served as a member of Netflix's Board since 2012. Kilgore served as Netflix's Chief Marketing Officer from 2000 until 2012 and is a member of the Audit Committee.  Defendant Kilgore is a citizen of Ohio.

37.     According to the DEF 14A, as of April 8, 2019, Defendant Kilgore beneficially owned 46,040 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Kilgore owned over $16 million worth of Netflix stock.

38.     According to the DEF 14A, during 2018, Defendant Kilgore received option awards valued at $377,861 as compensation for serving on the Company's Board.

39.     ***Defendant Ann Mather*** ("Mather") has served as a member of Netflix's Board since 2010.  Mather is Chair of the Audit Committee.  Defendant Mather is a citizen of California.

40.     According to the DEF 14A, as of April 8, 2019, Defendant Mather beneficially owned 38,960 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Mather owned over $14 million worth of Netflix stock.

41.     According to the DEF 14A, during 2018, Defendant Mather received option awards valued at $377,861 as compensation for serving on the Company's Board.

42.     ***Defendant Susan Rice*** ("Rice") has served as a member of Netflix's Board since 2018. Rice is a member of the Nominating and Governance Committee.  Rice was the United States National Security Advisor from 2013 to 2017 and served as the United States Ambassador to the United Nations from 2009 to 2013.  Defendant Rice is a citizen of the District of Columbia.

43.     According to the DEF 14A, as of April 8, 2019, Defendant Rice beneficially owned 2,448 shares of the Company's common stock.  Given that the price per share of the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

common stock at the close of trading on April 8, 2019 was $361.41, Rice owned over $880,000 worth of Netflix stock.

44.     According to the DEF 14A, during 2018, Defendant Rice received option awards valued at $285,978 as compensation for serving on the Company's Board.

45.     ***Defendant Bradford Smith*** ("Smith") has served as a member of Netflix's Board since 2015. Smith is a member of the Nominating & Governance Committee.  Defendant Smith is a citizen of Washington.

46.     Defendant Smith has played a leading role at Microsoft during the time in which Defendant Hastings served on that company's board of directors and Defendant Barton was employed there and founded Expedia.

47.     According to the DEF 14A, as of April 8, 2019, Defendant Smith beneficially owned 20,092 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Smith owned over $7 million worth of Netflix stock.

48.     According to the DEF 14A, during 2018, Defendant Smith received option awards valued at $377,861 as compensation for serving on the Company's Board.

49.     ***Defendant Anne Sweeney*** ("Sweeney") has served as a member of Netflix's Board since 2015.  Smith is a member of the Compensation Committee.  Defendant Sweeney is a citizen of California.

50.     According to the DEF 14A, as of April 8, 2019, Defendant Sweeney beneficially owned 7,925 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 8, 2019 was $361.41, Sweeney owned over $2.8 million worth of Netflix stock.

51.     According to the DEF 14A, during 2018, Defendant Sweeney received option awards valued at $377,861 as compensation for serving on the Company's Board.

52.     Defendants Hastings, Barton, Belmer, Dopfner, Haley, Hoag, Kilgore, Mather, Rice, Smith, and Sweeney are referred to herein as the "Director Defendants".

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Non-Party Officers**

53.     ***Spencer Neumann*** ("Neumann") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Netflix.

## NETFLIX'S CORPORATE GOVERNANCE

54.     As members of Netflix's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

55.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Netflix, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

56.     Netflix's Corporate Governance Committees are limited to an Audit Committee, Compensation Committee, and Nomination Committee.

57.     Netflix has no Shareholders Grievance Committee, Remuneration Committee, Risk Committee, Corporate Governance Committee, Corporate Compliance Committee, or Ethics Committee, among other omitted Committees.

## DUTIES OF THE DIRECTOR DEFENDANTS

58.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Netflix, the Director Defendants owed Netflix and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Netflix in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Netflix and its investors.

59.     Each director of the Company owes to Netflix and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

60.     To discharge their duties, the officers and directors of Netflix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Netflix were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Netflix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

61.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Netflix, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

62.     The Director Defendants breached their duties of loyalty and good faith by personally making and/or causing the Company to issue false and misleading statements regarding the Company's business prospects. As a result, Netflix has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## NETFLIX'S CODE OF ETHICS

63.     The Company's code of ethics states:

The Board of Directors of Netflix, Inc. (the "Company") has adopted this Code of Ethics (this "Code") for its directors, officers and other employees (individually, "Netflix Party" and collectively, "Netflix Parties"). As used herein, the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions are sometimes also referred to as the "Senior Financial Officers".

This Code has been reasonably designed to deter wrongdoing and to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;
- Compliance with applicable governmental laws, rules and regulations;
- The prompt internal reporting to an appropriate person or persons identified in this Code of violations of this Code; and
- Accountability for adherence to this Code.

64.     In violation of the Company's code of ethics, the Director Defendants conducted

little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Director Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Director Defendants' violations of law, including breaches of fiduciary duty. In violation of the Company's code of ethics, the Director Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Company's code of ethics.

## FALSE AND MISLEADING STATEMENTS

65.     During the Relevant Period, Netflix touted to investors that it expected to increase new subscribers by 5 million during the second quarter of 2019, even as it knew, or recklessly disregarded the fact that such increase would not materialize due to increases in subscriber subscription costs, particularly in the United States market where Netflix ended up *losing* new subscribers.

66.     In its Annual Report on Form 10-K, as amended by Form 10-K/A, for the year ended December 31, 2018, Netflix discussed various "Risk Factors" that may impact the Company. As first among these, Netflix addressed the fact that its business "will be adversely affected" if its "efforts to attract and retain members are not successful," including due to price increases.

> We have experienced significant membership growth over the past several years. Our ability to continue to attract members will depend in part on our ability to consistently provide our members with compelling content choices, as well as a quality experience for selecting and viewing TV series and movies. . . . *If consumers do not perceive our service offering to be of value, including if we* introduce new or adjust existing features, *adjust pricing or service offerings*, or change the mix of content in a manner that is not favorably received by them, *we may not be able to attract and retain members*. . . . *Members cancel our service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved*. We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base. […] [Emphasis added].

67.     On April 16, 2019, Netflix announced its financial results for Q1 2019 via a Letter to Shareholders appended as an exhibit to a Form 8-K filing with the SEC. The Letter to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Shareholders stated that Netflix had "recorded the highest quarterly paid net adds in [its] history" during the quarter (9.6 million), and that the Company forecast an additional 5 million new subscribers in Q2 2019. Although the Company was rolling out price increases in the United States and other markets, it expected its "gross additions [to be] unaffected" by such increases. The Company also stated that it was "looking forward" to the upcoming releases of new seasons of some of its most popular series, including Stranger Things on July 4, 2019.  As such, Netflix "expect[ed] another year of record annual paid net adds in 2019."

68.     The Letter to Shareholders stated, in relevant part:

Revenue surpassed $4.5 billion in Q1 and we recorded the highest quarterly paid net adds in our history (9.6m, up 16% year over year). For 20 years, we've had the same strategy: when we please our members, they watch more and we grow more.

**In Q1'19, average streaming paid memberships increased 26% year over year**, while ARPU [average revenue per user] decreased 2% year over year due to currency headwinds. Excluding F/X, global streaming ARPU improved 3% year over year and 2% sequentially. Year over year total revenue growth of 22% compares against 40% in Q1'18, which benefited from several price changes that took place in Q4'17 as well as F/X.  **On a F/X-neutral basis, Q1'19 revenue grew 28% year over year**.

*       *       *

Paid net adds in Q1 were 9.6 million (with 1.74m in the US and 7.86m internationally), up 16% year over year, representing a new quarterly record. As always, our quarterly guidance is our internal forecast at the time we report. **For Q2'19, we project total paid net adds of 5.0m (-8% year over year), with 0.3m in the US and 4.7m for the international segment.** This would put us at 14.6m paid net adds for the first half of 2019, up 7% year over year.

We're working our way through a series of price increases in the US, Brazil, Mexico and parts of Europe. **The response in the US so far is as we expected and is tracking similarly to what we saw in Canada following our Q4'18 increase, where our gross additions are unaffected**, and we see some modest short-term churn effect as members consent to the price change. **We're looking forward to a strong slate of global content in the second half of the year**, including new seasons of some of our biggest series, Stranger Things (July 4th), 13 Reasons Why, Orange is the New Black, The Crown and La Casa de Papel (aka Money Heist) as well as big films like Michael Bay's Six Underground and Martin Scorsese's The Irishman, and **expect another year of record annual paid net adds in 2019**.

**We forecast an acceleration in both streaming ARPU (+2% vs. -2%) and total revenue growth (26% vs. 22%) in Q2 vs. Q1**. Excluding currency, we forecast

streaming ARPU and total revenue would rise 7% and 32%, respectively in Q2. While there will be some quarter-to-quarter lumpiness in operating margins due to the timing of spending, our full year 2019 operating margin target of 13% is unchanged, which means that ***we expect operating margin in the second half of the year will be higher than the first half***.  [Emphasis added].

69.     Netflix also included in its Letter to Shareholders a chart showing its Q1 record net subscriber additions to continue to increase in Q2 2019:



70.     Later that same day, Netflix held its Q1 "Earnings Interview" with analysts.  During the call, Reed Hastings touted the Company's net subscriber additions during the quarter:

Well, we put in the earnings letter or weekly net ads and it's just phenomenal how steady and smooth and up into the right that is to start off the year with over 9.5 million net additions, it's a phenomenal start, so steady progress, basically the same as many prior quarters cranking away on amazing content, amazing service and steady growth around the world.

71.     UBS analyst Eric Sheridan asked Netflix's Vice President of Investor Relations and Corporate Development, Spencer Wang, how price increases in the United States might affect Netflix's expected subscriber growth in Q2.  Mr. Wang responded that he did not believe such price increases would affect the Company's Q2 subscriber growth, even if it resulted in some very temporary subscriber churn.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

You can see that we got it to 5 million of paid net adds in Q2, which is similar to where we were a year ago. There's definitely some seasonality to our business, which we see in Q2, you see that again this year, but *I'd say in general our paid net adds are very much in line with what we've been planning and targeting for the year*. On a first half of the year basis, you see that's 7% year-over-year growth.

The specific growth in Q2 is more concentrated internationally, that's just as we talked about last quarter, *we're rolling through our price changes in the US.* So that has some moderation on our net adds and the good news is there's that our -- *the growth in our acquisition that we're acquired it's consistent in terms of our ability to kind of grow our subscribers, there's just some temporary churn that enters the system in the midst of rolling out those price changes*, but that why you see more of the net adds weighted to our international segments in Q2. But overall very healthy going according to plan and very strong growth for the first half of the year and *putting us on track as we also mentioned in the letter for another year of record paid net add growths for the full year*.  [Emphasis added].

72.    Mr. Greg Peters, Netflix's Chief Product Officer, added that the price increases should not affect the Company's future net subscriber additions because the Company would make up for it by releasing new and exciting content.

I would just say, maybe there's a bunch of historical performance and modeling that we use to keep an eye on these things, but generally *I would say things are going as expected and this is one of those relatively infrequent moments where as we invest more and service more of great content*, we've got incredible movies coming like Irishman and 6 Underground, improving the product experience. We occasionally go back to our subscribers and ask them to contribute a little bit more, so that we can fund that next cycle of growth and everything that we're seeing right now is very consistent with that model.  [Emphasis added].

73.    Defendant Hastings similarly noted: "We got clear sailing ahead.  If we can produce the world's best content, we can deliver it with the best user interface, then we can grow for many, many years ahead."

74.    On April 18, 2019, Netflix filed a Form 10-Q with the SEC detailing its Q1 2019 results.  In the filing, Netflix stated that there had been "no material changes from the risk factors as previously disclosed" in its 2018 10-K. Netflix also discussed its "evaluation of disclosure controls and procedures," stating:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this

Quarterly Report on Form 10-Q. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q were effective*** in providing reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934, as amended, is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. [Emphasis added].

75.     The above statements were materially false and/or misleading because Defendants knew or recklessly disregarded that: (1) Netflix would not be able to add anywhere close to the amount of new subscribers in Q2 2019 that it was forecasting; (2) price increases, especially in the United States, would have a material negative impact on subscriber growth during Q2 2019; and (3) this conduct would subject the Defendants to liability under the securities laws.

## THE TRUTH IS REVEALED

76.     On July 17, 2019, Netflix announced its financial results for Q2 2019 via a Letter to Shareholders appended as an exhibit to a Form 8-K filing with the SEC.  The Letter to Shareholders revealed that Netflix's paid membership net additions during Q2 had been significantly below its guidance: "Paid membership grew by 2.7m, less than the 5.5m in Q2 a year ago and our 5.0m forecast." Moreover, declining membership growth was greater in regions with price increases, especially the United States, where prices increased and Netflix lost 126,000 subscribers.

77.     The Letter to Shareholders stated in relevant part:

As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report. We strive for accuracy (not conservatism), which means that in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

some quarters we will be high and other quarters low relative to our guidance. In Q2'19, our membership growth forecast was high.

*Our missed forecast was across all regions, but slightly more so in regions with price increases*. We don't believe competition was a factor since there wasn't a material change in the competitive landscape during Q2, and competitive intensity and our penetration is varied across regions (while our over-forecast was in every region). Rather, *we think Q2's content slate drove less growth in paid net adds than we anticipated*. Additionally, Q1 was so large for us (9.6m net adds), there may have been more pull-forward effect than we realized. In prior quarters with over-forecasts, we've found that the underlying long-term growth was not affected and staying focused on the fundamentals of our business served us well.

*   *   *

*While our US paid membership was essentially flat in Q2*, we expect it to return to more typical growth in Q3 and are seeing that in these early weeks of Q3. We forecast Q3 global paid net adds of 7.0m, up vs. 6.1m in Q3'18, with 0.8m in the US and 6.2m internationally. Our internal forecast still currently calls for annual global paid net adds to be up year over year. There's no change to our 13% operating margin target for FY19, up 300 basis points year over year.  [Emphasis added].

78.     Later that same day, Netflix held its Q2 "Earnings Interview" with analysts.  During the call, Spencer Wang (the Company's Vice President, Finance/Investor Relations) admitted that "pricing played a factor" in causing "elevated churn rates and lower retention" during the second quarter.

[G]enerally when we looked at the slowdown in subscriber growth was across all of our regions. So, you talk about our kind of top of funnel or gross adds we saw that slowed down across the board, which indicates to us some level of seasonality and kind of the overall, as we say the kind of timing of the content slate and also frankly maybe a little bit more pull forward of our subscriber growth from Q2 to Q1 because we had such a strong Q1 with 9.7 million paid net adds. *But, we also did see in regions where we increased prices, we did see some elevated churn rates and lower retention*. So, it was a combination of those two things, we think the primary story was around seasonality and timing in nature of our content slate but *pricing played a factor*.  [Emphasis added].

79.     On this news, the price of Netflix shares decreased from $362.44 per share on the last trading day prior to the announcement of Q2 results, to $325.21 per share on the first trading day following such announcement, or over 10%, on extremely high volume. The price of Netflix shares continued to fall during the next several trading days while volume remained elevated, reaching $310.62 per share on July 22, 2019, an overall decline of over 14%.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

80.     An article in *Business Insider*, "Netflix is set to see $17 billion in market value wiped out after a shocking drop in US subscribers," noted that Netflix's worldwide subscriber count fell well short of estimates during Q2 2019, but "[p]erhaps more troubling is the fact that the company's US paid-subscriber base shrunk by 130,000 in the second quarter, badly missing Wall Street's expectations of 309,240 additions."

81.     On July 22, 2019, the first federal securities class action complaint against Netflix was filed by a shareholder in the United States District Court for the Northern District of California, *Wallerstein v. Netflix, Inc., et. al.*, 19-cv-04195-LHK.

## DAMAGES TO NETFLIX

82.     As a direct and proximate result of the Director Defendants' conduct, Netflix will lose and expend many millions of dollars.

83.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

84.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Director Defendants who breached their fiduciary duties to the Company.

85.     As a direct and proximate result of the Director Defendants' conduct, Netflix has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

87.     Plaintiffs will adequately and fairly represent the interests of Netflix in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

88.     Plaintiffs are current owners of the Company stock and have continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of

conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

89.     During the wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

90.     The Company Board is currently comprised of eleven (11) members – Hastings, Barton, Belmer, Dopfner, Haley, Hoag, Kilgore, Mather, Rice, Smith, and Sweeney. Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

91.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation. Indeed, as Board members of Netflix, the Director Defendants were uniquely positioned to have access to management and were regularly apprised of Netflix's business and operations. This should have alerted them to the false statements about subscriber growth. According to a paper published by Stanford University researchers in May 2018, entitled "Netflix Approach to Governance: Genuine Transparency with the Board":

> Netflix takes a radically different approach to information sharing with the goal of significantly and efficiently increasing transparency among the CEO, executive team, and board of directors. The Netflix approach incorporates two highly unique practices: (1) board members periodically attend (in an observing capacity only) monthly and quarterly senior management meetings, and (2) board communications are structured as approximately 30-page online memos in narrative form that not only include links to supporting analysis but also allow open access to all data and information on the company's internal shared systems, including the ability to ask clarifying questions of the subject authors. This quarterly memo is written by and shared with the top 90 executives as well as the board.

> Founder and CEO Reed Hastings believes that these two practices improve the ability of the board to provide what he calls an "extreme duty of care" to the corporation: "The board isn't going to have the confidence to make hard decisions unless they really understand the market and the company." Netflix board members embrace the Netflix approach to board governance.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

92.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

93.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

94.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

95.     Additionally, each of the Director Defendants received payments, benefits, stock options (discussed above), and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Hastings**

96.     Defendant Hastings is not disinterested or independent, and therefore, is incapable of considering demand because he (as Netflix's founder and CEO) is an employee of the Company who derives substantially all his income from his employment with Netflix, making him not independent. As such, Defendant Hastings cannot independently consider any demand to sue himself for breaching his fiduciary duties to Netflix, because that would expose him to liability, including in the filed securities fraud lawsuits associated with the conduct described herein, and threaten his livelihood.

97.     Additionally, Netflix expressly acknowledged that Hastings is not independent in its Form DEF 14A filed with the SEC on April 23, 2019.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendants Barton, Kilgore, and Mather**

98.      During the Relevant Period, Defendants Barton, Kilgore, and Mather served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, engaging the Company's independent registered public accounting firm, reviewing the Company's financial controls, evaluating the scope of the annual audit and reviewing audit results, consulting with management prior to the presentation of financial statements to stockholders, and initiating inquiries into the adequacy of Company's internal accounting controls and financial affairs.

99.      Barton, Kilgore, and Mather breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the disclosure issues and other deficiencies described above. Therefore, these defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Belmer, Haley, Hoag, and Sweeney**

100.      During the Relevant Period, Defendants Belmer, Haley, Hoag, and Sweeney serve as members of the Compensation Committee. Pursuant to the Company's Compensation Committee Charter, the members of the Compensation Committee are responsible for, *inter alia*, reviewing and approving all forms of compensation to be provided to the executive officers and directors of the Company.

101.      Belmer, Haley, Hoag, and Sweeney face a substantial likelihood of liability for their approval of millions of dollars in salary and granted stock options to Netflix's executive officers and directors, including Hastings, Neumann, and themselves.   In 2019, the members of the Compensation Committee approved Hasting's annual salary of $700,000 and annual stock option allocation of $30,800,000. They also approved Spencer Neumann's annual salary of $5,000,000 and annual stock option allocation of $5,000,000. The members of the Compensation Committee approved grants of stock option awards to themselves and the other Director Defendants (other than Mr. Hastings) in 2018 collectively worth millions of dollars.

102.     Therefore, these Defendants could not have acted independently during the relevant period and are aligned with Hastings and Neumann, who have been named as defendants in securities fraud lawsuits regarding the conduct alleged herein. These Defendants therefore face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendant Smith**

103.     Defendant Smith was one of the highest-ranking and longest-serving employees of Microsoft during the time when Defendant Hastings was a member of Microsoft's board of directors.  Defendant Smith's role at Microsoft was subject to the oversight of the members of its board directors, including Defendant Hastings. To the extent that Defendant Smith owed his continuing employment with Microsoft to Defendant Hastings, he cannot act independently as he remains beholden to Defendant Hastings. Demand upon Defendant Smith is therefore futile.

**Defendants Barton and Hoag**

104.     Defendant Hoag has served on the Board of Defendant Hastings' Company for the past 20 years and owns nearly $2 billion worth of Netflix stock.  Due to his close professional ties to Defendant Hastings and interest in "his" Company, Defendant Hoag cannot independently consider a demand, and it is therefore futile.

105.     Defendants Hoag and Barton have served together on the board of directors of Zillow Group for the past 13 years. Defendant Barton's longstanding professional ties to Defendant Hoag prevents the former from independently considering a demand, which is therefore futile.

**COUNT I**

**Against the Director Defendants for Breach of Fiduciary Duty**

106.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

107.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

108.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

109.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

111.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Director Defendants for Waste of Corporate Assets

112.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

113.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

114.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain

officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

115.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

116.    Plaintiffs, on behalf of Netflix, have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)    Awarding such other and further relief as is just and equitable.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY TRIAL DEMANDED**

2      Plaintiffs hereby demand a trial by jury.

3

4    Dated: November 25, 2019                          **BRODSKY & SMITH, LLC**

5                                              By:

6                                                   Evan J. Smith, Esquire (SBN 242352)
                                                    esmith@brodskysmith.com
7                                                   Ryan P. Cardona, Esquire (SBN 302113)
                                                    rcardona@brodskysmith.com
8    **OF COUNSEL:**                                9595 Wilshire Blvd., Ste. 900
     **GAINEY McKENNA & EGLESTON**                  Phone:  (877) 534-2590
9    Thomas J. McKenna                              Facsimile (310) 247-0160
     Gregory M. Egleston
10   440 Park Avenue South, 5th Floor
11   New York, NY 10016
     Telephone: (212) 983-1300
12   Facsimile: (212) 983-0383
     Email: tjmckenna@gme-law.com
13   Email: gegleston@gme-law.com
14   -and-

15
     **MOORE KUEHN, PLLC**
16   Justin A. Kuehn
17   Fletcher W. Moore
     30 Wall Street, 8th floor
18   New York, New York 10005
     Tel: (212) 709-8245
19   Email: jkuehn@moorekuehn.com
     Email: fmoore@moorekuehn.com
20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 24 -